# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | | |
|---|---|---|
| **BERNARDO ACOSTA,** | § | |
| *Plaintiff* | § | |
| | § | |
| **v.** | § | **Case No. 1:21-cv-00615-DII** |
| | § | |
| **WILLIAMSON COUNTY, TEXAS** | § | |
| **and ALYSSA HOFFMAN,** | § | |
| *Defendants* | § | |

## ORDER AND REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

### TO: THE HONORABLE DISTRICT COURT

Before the Court are Defendant Williamson County, Texas, and Alyssa Hoffman's Motion for Summary Judgment, filed May 10, 2023 (Dkt. 115); Plaintiff's Opposed Motion for Leave to Amend Complaint, filed June 6, 2023 (Dkt. 119); and the associated response and reply briefs. By Text Orders entered June 12, 2023 and June 21, 2023, the District Court referred the Motions to this Magistrate Judge for a report and recommendation and disposition, respectively, pursuant to 28 U.S.C. § 636(b)(1), Federal Rule of Civil Procedure 72, and Rule 1 of Appendix C of the Local Rules of the United States District Court for the Western District of Texas.

## I.     Factual Background

Plaintiff Bernardo Acosta filed this civil rights lawsuit after he was arrested in Williamson County, Texas for the offense of driving while intoxicated and spent the night in jail.

Acosta was taken into custody at about 8:40 p.m. on May 27, 2021. Dkt. 115-1 at 2. Once he arrived at the Williamson County Jail, Williamson County Sheriff's Office Medical Sergeant Ariel Korn[1] interviewed him and completed a medical intake form summarizing his medical history and

---

[1] Korn later married and changed her name to last name to Gibson, which the Court uses hereinafter.

prescribed medications. Dkt. 115-2. Acosta told Gibson that he suffers from depression, anxiety, and post-traumatic stress disorder ("PTSD"), and that he was prescribed Prazosin, Gabapentin, Flexeril, and Citalopram. *Id.* at 2-3. Although Acosta also alleges that he suffers from sleep apnea and uses a continuous positive airway pressure ("CPAP") machine, he did not disclose that to Gibson. *Id.*

After Acosta's initial booking, Williamson County Sheriff's Office Corrections Officer Alyssa Hoffman escorted him to a holding cell. Acosta Tr. at 91:1-2, Dkt. 122-7 at 23. Acosta asked Hoffman if he could call his wife so she could bring his PTSD prescription medication and CPAP machine to the jail. *Id.* at 86:21-23, Dkt. 11-7 at 22. Acosta alleges that Hoffman "refused to allow him to request his medication from his wife" and "maliciously slammed Acosta's hand in the holding cell door," which "resulted in an open fracture of the left ring finger." Second Amended Complaint, Dkt. 34 ¶ 18. Acosta alleges that Hoffman's "use of force" against him "by using her entire body weight in slamming the door on his hand was clearly excessive," in violation of his Fourth Amendment rights under the United States Constitution. *Id.* ¶ 93.

After his finger was injured, Acosta alleges, he "pleaded for help and received none for an extended period of time, writhing in pain from an open fracture and severe blood loss." *Id.* ¶ 20. Because "his pleas were originally being ignored," Acosta alleges, he "spread blood covering an entire window so they would see the injury was real." *Id.* ¶ 21. Acosta alleges that his "severe blood loss and incarceration triggered a PTSD episode." *Id.* After "nearly half an hour in pain," he was "removed from the cell to the general in-processing area," then moved to a private cell. *Id.* ¶¶ 22, 24. Acosta contends that he "never received his PTSD medication or his CPAP machine the entire time he was incarcerated, despite his pleas for both, and the fact his wife had provided his PTSD medication to Williamson County personnel." *Id.* After he was released from jail the next

morning, Acosta alleges that he went to an urgent care center, where he was diagnosed with a broken finger. *Id.* ¶ 25.[2]

The County denies most of Acosta's allegations. It relies on surveillance videos,[3] officers' deposition testimony,[4] Acosta's deposition testimony,[5] and official incident reports and memoranda from the involved officers[6] to support its argument that Hoffman never used any force against Acosta, let alone excessive force. "Instead, this case amounts to an *accident* in which *the tip of Acosta's finger* was caught between the cell door frame and the cell door as Hoffman concluded [a] conversation with Acosta and closed the cell door." Dkt. 115 at 8. The County contends that Hoffman did not know Acosta's left index finger was in the doorframe when she closed the door, pinching the tip of Acosta's finger. Dkt. 115-8; Hoffman Tr. at 150:1-153-10, Dkt. 121-24 at 39. The County contends that Acosta suffered a *de minimis* injury to his fingertip and that medically trained officers swiftly provided medical care.

The County contends that after Acosta was taken to his holding cell and requested his PTSD medication and CPAP machine from Hoffman, she "explained Williamson County Sheriff's Office policy[7] on prescription medications and CPAP machines, telling Acosta that he could call a family member and have his medications and CPAP machine delivered to the jail." Dkt. 115 at 4; *see also* Dkt. 115-3; Hoffman Tr. at 42:1-12, Dkt. 121-24 at 12. Hoffman then left Acosta's cell and carried on with other duties. Although there was a phone in his holding cell he could use, Acosta testified

---

[2] Acosta submits no medical records in support of this allegation.

[3] Dkts. 115-4, 115-5.

[4] Dkts. 115-14, 115-15, and 115-17.

[5] Dkt. 115-16.

[6] Dkts. 115-3, 115-6, 115-7, and 115-8.

[7] The "Medical Services to be Provided" policy (Dkt. 115-9) details the steps that should be taken when a pretrial detainee requests prescription medications.

in his deposition that he did not use it because he was concerned that other inmates could hear his conversation. Acosta Tr. at 87:16-88:25, Dkt. 122-7 at 22.

Around 12:05 a.m. on May 28, 2021, surveillance video shows Hoffman walking toward Acosta's jail cell and then opening the cell door and handing Acosta's cellmate a blanket.[8] Dkt. 115-4 at 0:29-33. Hoffman testified that when she opened the cell door, Acosta again asked for his prescription medication and CPAP machine. Hoffman Tr. at 147:19-148:4, Dkt. 121-24 at 38. Hoffman testified that she had told Acosta twice before that he would have to call his wife to request those items, and gave the same explanation for a third time. *Id.* at 148:15-149:4. Acosta then began to raise his voice at Hoffman, at which point she told him that she "was not going to continue giving him the same instructions" and "informed him that [she] was going to close the door." *Id.* at 149:19-150:7, Dkt. 121-24 at 38-39. Hoffman stated in her Incident Report that:

> As I began to close the door, Mr. Acosta put his foot in the way so that I could not close the door and also pushed on the door with his [right] hand. Due to his resistance, I used my shoulder to push my body weight on the door so that I could secure the door. I then walked away from the cell to continue my duties.

Dkt. 115-3 at 2. Hoffman testified that she never saw Acosta's hand on the door or in the doorframe when she closed the cell door. Hoffman Tr. at 150:11-13; 153:1-10, Dkt. 121-24 at 39. She also testified that Acosta gave no indication that he was injured when she closed the door. *Id.* at 153:11-14. Hoffman testified she did not intend to injure Acosta's hand "in any way." *Id.* at 154:19-22.

Surveillance video shows Hoffman talking to Acosta in a non-combative manner for more than two minutes before she closes his cell door at 12:08 a.m. Dkt. 115-4 at 3:06-3:10. The video also shows that Hoffman closed the door with her hands and nudged it closed with her left shoulder and hip, then walked back to her desk in the central booking area. *Id.* About eight seconds after

---

[8] Hoffman testified she went to the cell to bring Acosta's cellmate a blanket. Hoffman Tr. at 147:11-15, Dkt. 121-24 at 38.

Hoffman closes the cell door, Acosta can be seen wiping blood on his cell window with his left index finger and holding his finger up in the window. *Id.* at 3:18-6:34, 7:20-10:03. It does not appear that Hoffman or any of the officers in the holding cell area notice Acosta's injury for about three minutes, when Acosta alerts Booking Officer Herrera (who was walking by his cell) that his finger is injured around 12:12 a.m. *Id.* at 6:34-53; Dkt. 115-7 at 2.

Three minutes later, at about 12:15 a.m., Medical Sergeant Gibson, Medical Officer Jose Garza, and three other officers arrive at Acosta's cell to attend to his injury. Dkt. 115-4 at 10:03; Dkt. 115-7 at 2. The officers open Acosta's cell door and ask him to leave the cell so they can evaluate his injury. Dkt. 115-4 at 10:04-52; Dkt. 115-7 at 2. Garza states in a memorandum to his supervisor that Acosta was "yelling to the Correctional staff that he has rights, and he shouldn't be treated like an animal because he served in the Military," and that he needed his medications and CPAP machine. Dkt. 115-7 at 2. Video shows that after Acosta leaves his cell and sits on a bench in the general booking area, Garza examines, cleans, and bandages his finger. Dkt. 115-4 at 11:52-14:45; Dkt. 115-5 at 0:00-50; Dkt. 115-7 at 2. Garza states in his memorandum that Acosta had "a small laceration on his left-hand ring finger which was located just above the nail cuticle." Dkt. 115-7 at 2. Garza determined that the cut "was small enough to not need further care other than cleaning and bandaging it there at the scene." *Id.* He also observed that Acosta "had a full range of motion and was able to move and bend his hand and fingers with no issues." *Id.* Garza used "gauze and medical tape to cover the wound," and Acosta "thanked [Officer Garza] for assisting him." *Id.*

As Garza bandages Acosta's finger, Acosta asks repeatedly for his prescription medications and CPAP machine. *Id.* Gibson states in her memorandum to her supervisor that she explained the "policy regarding medications multiple times to Mr. Acosta and told him that he could call his family/his wife to bring his medications to the jail and we would give them to him at the prescribed

times listed on the prescription." Dkt. 115-6 at 3. Gibson reports that Acosta responded: "You want me to wake up my wife up at midnight and have her load up my kids in the car and drive from Bertram to bring me my medications?" *Id.* Gibson told Acosta that it was his choice whether to call his wife but she could not give him medication without a prescription. *Id.* Acosta "said that he would call his wife and went to use the phone in booking." *Id.*

After Acosta called his wife, he was transferred to a single jail cell in the Infirmary so he could use his CPAP machine once it arrived. *Id.*; Dkt. 115-7 at 3. Around 2:30 a.m., Acosta's wife dropped off his prescription medications, but not his CPAP machine. Jail phone call recording between Acosta and his wife, Dkt. 115-11 at 1:16-1:54; Gibson Tr. at 112:6-12, Dkt. 115-17 at 3. Defendants state Acosta "was unable to receive his prescription medications in the middle of the night due to the jail's policy requiring pharmacist or physician review and verification of non-life-sustaining prescription medications delivered to the jail for inmates and detainees." Dkt. 115 at 5.

At 9 a.m., Acosta was evaluated by Medical Lieutenant Doug Wheless, the head supervisor of the Williamson County Sheriff's Office Medical Department, who states: "There was no visible injury to his left ring finger after his bandage was removed" apart from "breaks in the skin." Dkt. 115-8 at 2. Wheless gave Acosta a solution to soak his finger in "if he was worried about infection." *Id.* Wheless concludes: "No other higher care was needed, and Mr. Acosta did not require a hospital." *Id.* Acosta then returned to his cell and was "processed for his departure." *Id.*

## II.    Procedural Background

Acosta filed this civil rights suit against the County and Williamson County Sheriff's Officers Hoffman, Garza, Gibson, Ruben Vela, Roberto Rodriguez, and Fernando Morales ("Individual Defendants"). Acosta sued the County for denying him reasonable medical care in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, under 42 U.S.C. § 1983; disability discrimination under the Americans with Disabilities Act ("ADA") and

the Rehabilitation Act; and negligence and gross negligence under Texas state law. Acosta sued the Individual Defendants for excessive force in violation of the Fourth Amendment, under § 1983; negligence; gross negligence; and assault and battery. Dkt. 34.

The County filed a partial motion to dismiss Acosta's § 1983 and negligence and gross negligence claims. Dkt. 38. Individual Defendants Garza, Gibson, Vela, Rodriguez, and Morales moved to dismiss all of Acosta's claims. Dkt. 51. Hoffman filed a partial motion to dismiss Acosta's negligence and gross negligence claims. Dkt. 50. This Magistrate Judge recommended that the District Court grant all three motions to dismiss. Dkt. 76 at 24. The District Court adopted the Report and Recommendation in full and dismissed Acosta's excessive force, deliberate indifference, failure to train and supervise, gross negligence, and punitive damages claims against the County; his excessive force claims and assault and battery claims against Individual Defendants Garza, Gibson, Vela, Rodriguez, and Morales; and his negligence and gross negligence claims against all the Individual Defendants. Dkt. 79. Acosta's ADA, Rehabilitation Act, and negligence claims against the County, and his claims for excessive force and assault and battery against Officer Hoffman, survived.

The County and Hoffman now move for summary judgment on Acosta's surviving claims under Rule 56. Acosta opposes the Motion and also seeks leave to file a third amended complaint.

### III.    Summary Judgment Standard

Summary judgment will be rendered when the pleadings, the discovery and disclosure materials, and any affidavits on file show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute over a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. "However, '[courts] assign greater weight, even at the summary judgment stage, to the . . . video recording[s] taken at the scene." *Baker v. Coburn*, 68 F.4th 240, 244 (5th Cir. 2023) (quoting *Betts v. Brennan*, 22 F. 4th 577, 582 (5th Cir. 2022)). A court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

Once the moving party has made an initial showing that no evidence supports the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence and thus cannot defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation also are not competent summary judgment evidence. *Id.* The party opposing summary judgment must identify specific evidence in the record and articulate the precise manner in which that evidence supports its claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

A qualified immunity defense, however, changes the usual summary judgment burden of proof. *Hanks v. Rogers*, 853 F.3d 738, 744 (5th Cir. 2017). "Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Id.*

### IV.    Officer Hoffman's Motion for Summary Judgment

Acosta asserts a Fourth Amendment excessive force claim under 42 U.S.C. § 1983 and a state claim of assault and battery against Hoffman. Hoffman argues that she is entitled to summary judgment on both claims.

#### A. Excessive Force Claim

Acosta alleges that Hoffman used excessive force against him in violation of his "Fourth Amendment"[9] rights when she allegedly slammed the jail cell door on his hand. Dkt. 34 ¶ 93. Hoffman argues that she is entitled to qualified immunity because the summary judgment evidence shows she did not commit a constitutional violation.

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether qualified immunity applies, courts generally engage in a two-part inquiry: "(1) whether an official's conduct violated a statutory or constitutional right of the plaintiff; and (2) whether the right was 'clearly established' at the time of the violation." *Baker*, 68 F.4th at 245.[10] "If the plaintiff fails at either step, the federal court can grant qualified immunity by addressing either step or both of them." *Cleveland v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019).

---

[9] Although Acosta invokes the Fourth Amendment, the Fifth Circuit has held that a pretrial detainee's excessive force claim should be analyzed under the Due Process Clause of the Fourteenth Amendment when, as here, the plaintiff is not challenging the legality of his detention. *See Brooks v. George Cnty., Miss.*, 84 F.3d 157, 167 (5th Cir. 1996) ("The Fourth Amendment is inapplicable to a pretrial detainee who was properly arrested and is awaiting trial. That detainee has recourse to due process protections, not protection against unreasonable seizures after a lawful seizure has occurred."). The Court analyzes Acosta's excessive force claim under the Due Process Clause of the Fourteenth Amendment.

[10] "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015). A case need not be "directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

### 1. Elements

To prevail on an excessive force claim under the Due Process Clause, a plaintiff must show "that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015). In *Kingsley*, the Supreme Court explained that "the defendant must possess a purposeful, a knowing, or possibly a reckless state of mind." *Id.* at 396. "That is because . . . 'liability for *negligently* inflicted harm is categorically beneath the threshold of constitutional due process.'" *Id.* (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)). Instead, "due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property." *Daniels v. Williams*, 474 U.S. 327, 331 (1986). Thus, "the Due Process Clause of the Fourteenth Amendment is not implicated by the lack of due care of an official causing unintended injury to life, liberty or property. In other words, where a government official is merely negligent in causing the injury, no procedure for compensation is constitutionally required." *Davidson v. Cannon*, 474 U.S. 344, 347 (1986). As the *Daniels* Court explained:

> The Fourteenth Amendment is a part of a Constitution generally designed to allocate governing authority among the Branches of the Federal Government and between that Government and the States, and to secure certain individual rights against both State and Federal Government. When dealing with a claim that such a document creates a right in prisoners to sue a government official because he negligently created an unsafe condition in the prison, we bear in mind Chief Justice Marshall's admonition that "we must never forget, that it is a *constitution* we are expounding." Our Constitution deals with the large concerns of the governors and the governed, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society. We have previously rejected reasoning that "would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States."

*Id.* at 332 (citations omitted).

"Objective reasonableness" turns on the "facts and circumstances of each particular case," and various factors "may bear on the reasonableness or unreasonableness of the force used," such as:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Kingsley*, 576 U.S. at 397. In determining objective reasonableness, a court must also "account for the legitimate interests that stem from the government's need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." *Id.* (cleaned up).

## 2. Analysis

Acosta alleges that Hoffman's use of force "by using her entire body weight in slamming the door on his hand was clearly excessive to the need, objectively unreasonable in light of clearly established law, and directly caused Mr. Acosta's injuries." Dkt. 34 ¶ 93. But other than his own conclusory allegations, Acosta fails to come forward with any competent summary judgment evidence to support his argument that Hoffman "maliciously slammed Acosta's hand in the holding cell door." *Id.* ¶ 19. Rather, the summary judgment evidence supports Defendants' argument that Hoffman accidentally closed the cell door on the tip of Acosta's left index finger.

At deposition, Hoffman repeatedly testified that she (1) did not "intentionally cause bodily injury" to Acosta, 154:13-155:13, Dkt. 121-24 at 40; (2) never saw Acosta's left hand or finger on the door or in the doorframe when she closed the door, 153:1-10, Dkt. 121-24 at 39; and (3) did not realize that Acosta's finger was injured when she closed the door, *id.* at 153:10-14. The surveillance video of the incident supports her testimony. The video shows Hoffman talking to Acosta in a non-combative manner for about three minutes before she ends the conversation and

closes his cell door by using her hands and nudging it closed with her left shoulder and hip. Dkt. 115-4 at 3:06-3:10. The video does not show Acosta's hand in the door frame or Hoffman "maliciously slamming" the cell door "by using her entire body weight," as Acosta alleges. As Lieutenant Jeffrey Pearson testified at deposition, Hoffman's closing of the cell door did not "constitute a use of force" but "was an accident. . . . She was simply shutting a door." Pearson Tr. at 106:4-14, Dkt. 115-15 at 4.

The evidence supports Defendants' argument that Hoffman accidentally closed the cell door on Acosta's left index finger. Such accidental conduct does not show that Hoffman possessed "a purposeful, a knowing," or even "a reckless state of mind," which is required to show an unconstitutional use of excessive force. *See Kingsley,* 576 U.S. at 396 (stating that "if an officer's Taser goes off by accident or if an officer unintentionally trips and falls on a detainee, causing him harm, the pretrial detainee cannot prevail on an excessive force claim"); *Daniels*, 474 U.S. at 328 (holding that inmate who slipped on a pillow negligently left on a stairway by a jail official failed to allege a due process violation); *see also Lewis*, 523 U.S. at 854 (stating that "high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment"). Hoffman did not use unconstitutional excessive force.

## B. Assault and Battery

Acosta also alleges that Hoffman committed an assault and battery against him under Texas law[11] when she "intentionally, knowingly and/or recklessly slammed the jail cell door on Mr. Acosta's hand." Dkt. 34 ¶ 96. Defendants argue that Hoffman is immune from Acosta's assault and battery claim under Section 101.106(f) of the Texas Tort Claims Act ("TTCA"), TEX. CIV.

---

[11] "An assault occurs when a person is in apprehension of imminent bodily contact, whereas a battery is committed when an individual actually sustains a harmful or offensive contact to his or her person." *City of Watauga v. Gordon*, 434 S.W.3d 586, 589 (Tex. 2014).

PRAC. & REM. CODE § 101.106(f). Acosta does not respond to this argument, but contends his claim falls under the TTCA's limited waiver provision in Section 101.021(2).

### 1.  Section 101.021(2)

"The State, its agencies, and subdivisions, such as counties, generally enjoy sovereign immunity from tort liability unless immunity has been waived." *Cnty. of Cameron v. Brown*, 80 S.W.3d 549, 554 (Tex. 2002). The plaintiff has the burden to "affirmatively demonstrate the court's jurisdiction by alleging a valid waiver of immunity." *Dallas Area Rapid Transit v. Whitley*, 104 S.W.3d 540, 542 (Tex. 2003). The TTCA waives sovereign immunity enjoyed by Texas "governmental unit[s]"[12] when the plaintiff's claims arise from:

> (1) the negligent conduct of an employee if property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or equipment if the employee would be personally liable to the claimant; and (2) from injuries caused by a condition or use of tangible personal property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law.

*Texas Dep't of Pub. Safety v. Petta*, 44 S.W.3d 575, 580 (Tex. 2001) (citing TTCA §101.021(2)).

Acosta argues that Section 101.021(2) applies here because Officer Hoffman used the "Williamson County jail cell door as a weapon . . . by intentionally, knowingly and recklessly slamming the door on Plaintiff's finger out of spite." Dkt. 121 at 15. But Section 101.021(2) applies only to "governmental unit[s]," not individual defendants. TTCA § 101.021(2); *see also Goodman v. Harris Cnty.*, 571 F.3d 388, 394 (5th Cir. 2009) ("The TTCA does not . . . include individuals under its definition of a governmental unit."). Thus, "[i]ndividuals may not be sued under the TTCA as the act does not govern suits brought directly against an employee of the State." *Id.* (citation omitted).

---

[12] TEX. CIV. PRAC. & REM CODE §101.021(2).

Furthermore, while the TTCA waives governmental immunity for certain negligent conduct, "it specifically excludes waiver for a claim 'arising out of assault, battery, false imprisonment, or any other intentional tort.'" *Petta*, 44 S.W.3d at 580 (quoting TTCA § 101.057(2)[13]); *see also Gordon*, 434 S.W.3d at 594 ("The Texas Tort Claims Act waives governmental immunity for certain negligent conduct, but it does not waive immunity for claims arising out of intentional torts, such as battery."). Acosta's assault and battery claim against Hoffman does not state a claim for which governmental immunity has been waived. *See Gordon*, 434 S.W.3d at 594 ("Because Gordon alleges that the police used excessive force in his arrest, a claim that arises out of a battery, his pleadings do not state a claim for which governmental immunity has been waived under the Tort Claims Act.").

### 2. Section 101.106(f) Immunity

Hoffman argues that she is statutorily immune from suit under TTCA § 101.106(f), which provides:

> If a suit is filed against an employee of a governmental unit based on conduct within the general scope of that employee's employment and if it could have been brought under this chapter against the governmental unit, the suit is considered to be against the employee in the employee's official capacity only. On the employee's motion, the suit against the employee shall be dismissed unless the plaintiff files amended pleadings dismissing the employee and naming the governmental unit as defendant on or before the 30th day after the date the motion is filed.

Under the common law, public employees are "individually liable for their own torts, even when committed in the course of employment." *Garza v. Harrison*, 574 S.W.3d 389, 399 (Tex. 2019) (citation omitted). Section 101.106 "alters the common-law scheme by requiring

---

[13] "This chapter does not apply to a claim . . . arising out of assault, battery, false imprisonment, or any other intentional tort, including a tort involving disciplinary action by school authorities."

plaintiffs to choose between suing the governmental unit under the Act and suing a responsible employee in an individual capacity." *Id.*

> Unlike official immunity, which is an affirmative defense that bars a governmental employee's individual liability, section 101.106(f) essentially prevents an employee from being sued at all for work-related torts and instead provides for a suit against the governmental employer. . . . which mandates dismissal when a suit against a governmental employee (1) is "based on conduct within the general scope of [the] employee's employment" and (2) "could have been brought under [the Act] against the governmental unit."

*Id.* at 399-400 (quoting § 101.106(f)).

TTCA § 101.001(5) defines "scope of employment" as "the performance for a governmental unit of the duties of an employee's office or employment and includes being in or about the performance of a task lawfully assigned to an employee by competent authority."

> [T]he critical inquiry is whether, when viewed objectively, a connection exists between the employee's job duties and the alleged tortious conduct. Simply stated, a governmental employee is discharging generally assigned job duties if the employee was doing his job at the time of the alleged tort. For purposes of section 101.106(f), the employee's state of mind, motives, and competency are irrelevant so long as the conduct itself was pursuant to the employee's job responsibilities.

*Garza*, 574 S.W.3d at 401 (cleaned up). Stated simply: "The scope-of-employment inquiry under section 101.106(f) focuses on whether the employee was doing his job, not the quality of the job performance." *Id.* at 394.

Even if a defendant "stepped outside of his official duties" by "engag[ing] in malicious conduct," he will be immune if his actions are linked to his job responsibilities because "whether an official's act is unlawful does not determine whether that act is within the scope of his employment." *Smith v. Heap*, 31 F.4th 905, 914 (5th Cir. 2022). So even intentional torts can be within the scope of employment. *De La Garza v. City of New Braunfels*, No. 5:19-CV-01455-XR, 2021 WL 3620440, at *4 (W.D. Tex. Aug. 16, 2021); *see also City of Lancaster v. Chambers*, 883

S.W.2d 650, 658 (Tex. 1994) ("An official acts within the scope of her authority if she is discharging the duties generally assigned to her.").

When Hoffman allegedly assaulted Acosta, she was working as a correctional officer for the Williamson County Sheriff's Office. Her job responsibilities included escorting detainees to their holding cells, interacting with detainees, opening and closing cell doors, bringing requested items to detainees, and ensuring that detainees remained secured in their cells.[14] Hoffman was performing her normal job duties when she allegedly assaulted Acosta by closing the cell door on his finger because securing detainees in their cells and closing cell doors were part of her normal job responsibilities. *See City of Lancaster*, 883 S.W.2d at 658 (finding that police officers allegedly driving recklessly in a high-speed chase were still acting within the scope of their duties); *Tipps v. McCraw*, 945 F. Supp. 2d 761, 767 (W.D. Tex. 2013) ("As law enforcement officers, [defendants] were generally acting within the scope of their duties in investigating a potential crime, applying for a warrant, and making an arrest. Even if conducted with improper motives or in an improper manner, the actions remain within the general scope of duties of law enforcement officers."). Acosta does not dispute that Hoffman was acting within the scope of her employment when she allegedly assaulted him. *See* Response, Dkt. 121 at 15 ("At the time of the door slam, Hoffman acted in her scope of employment by intentionally, knowingly and recklessly slamming the door on Plaintiff's finger out of spite."). Accordingly, there is no material dispute that Hoffman was acting within the scope of her job duties when she allegedly assaulted Acosta.

As to the second element, Acosta could have brought an assault claim against the County under the TTCA. All common law tort theories alleged against a governmental unit are assumed to be under the TTCA and so "could have been brought" against the governmental unit, even if the

---

[14] Hoffman Tr. at 53:4-25, 75:12-77:18, 147:10-22, 151:11-152:16, Dkt. 121-24 at 14, 20, 38-39.

governmental unit's immunity is not waived by the Act. *Wilkerson v. Univ. of N. Tex.*, 878 F.3d 147, 161 n.16 (5th Cir. 2017); *see also Franka v. Velasquez*, 332 S.W.3d 367, 379-80 (Tex. 2011) (rejecting reading section 101.106(f) to require as requiring the employee to establish a waiver of the government's immunity); *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 659 (Tex. 2008) (stating that subsection (f) is satisfied even if immunity is not waived under the Tort Claims Act). Section 101.106(f) "asks not whether a plaintiff can succeed on the merits, but whether her claim sounds in tort." *De La Garza*, 2021 WL 3620440, at *4. Acosta's claims sound in tort and "could have been brought" against the County even though the TTCA does not waive the County's immunity for intentional torts. *See id.* (holding that false imprisonment claim could have been alleged against the city even though it was immune under the TTCA).

Because Acosta's assault claim against Hoffman is "based on conduct within the general scope" of her employment and "could have been brought" against the County, she is entitled to immunity under Section 101.106(f). The Court recommends that the District Court grant summary judgment to Hoffman on both claims asserted against her.

## V.   Williamson County's Motion for Summary Judgment

Acosta's surviving claims against the County include a common law negligence claim under Texas law and disability discrimination under the ADA and the Rehabilitation Act. The County argues that it is entitled to summary judgment on all these claims.

## A.  Negligence

To prevail on his negligence claim, Acosta must show that the County (1) had a legal duty and (2) breached that duty, and that (3) he suffered damages proximately caused by the breach. *Elephant Ins. Co. v. Kenyon*, 644 S.W.3d 137, 144 (Tex. 2022). Because governmental units are immune from suit under the TTCA, Acosta also must show that the County's immunity has been waived. *Whitley*, 104 S.W.3d at 540.

Acosta alleges in his Complaint that (1) "Williamson County and the Individual Jailers had a legal duty of care to Mr. Acosta as a pretrial detainee in their custody"; (2) the Individual Jailers breached that duty when they allegedly slammed Acosta's hand in the jail cell door and failed to provide him with "appropriate medical care"; and (3) the Individual Jailers' actions proximately caused his injuries. Dkt. 34 ¶ 78. Acosta further argues that the County was negligent in failing to properly train and discipline Hoffman "for her actions and for her lack of knowledge of County policies." Dkt. 121 at 30.

Acosta argues that the County's immunity from his negligence claim has been waived under Section 101.021(2) of the TTCA because "personal property was used to injure Plaintiff." *Id.* As discussed, the TTCA does not waive immunity for claims arising out of intentional torts. TTCA § 101.057(2). A plaintiff cannot avoid a governmental unit's sovereign immunity by pleading an intentional tort claim as a negligence claim. *See Aguirre v. City of San Antonio*, 995 F.3d 395, 422 (5th Cir. 2021) ("[I]ntentional conduct, no matter how it is pled, falls under the TTCA's sovereign immunity waiver exception."); *Quinn v. Guerrero*, 863 F.3d 353, 363 (5th Cir. 2017) ("If plaintiffs classify intentional-tort claims as negligence claims, governmental immunity still applies."). But that is what Acosta has done here.

Acosta alleges that the County is vicariously liable for Hoffman's "negligence" when she "slammed Mr. Acosta's hand in the jail cell" door. Dkt. 34 ¶ 78. Acosta repeatedly alleges that Hoffman "deliberately" or "intentionally" slammed the jail cell door on his hand. *Id.* at 1, ¶¶ 18, 29, 93, 96; Dkt. 121 at 1, 6, 7, 9, 15. Acosta alleges that this part of his negligence claim is based on intentional conduct, which "is a quintessential intentional tort claim." *Aguirre*, 995 F.3d at 422; *see also Gordon*, 434 S.W.3d at 592 ("[A] specific intent to inflict injury is without question an intentional tort."). Moreover, the gravamen of Acosta's negligence claim against the County is that Hoffman used excessive force against him when she allegedly slammed the jail cell door. "Claims

of excessive force . . . arise out of a battery rather than negligence, whether the excessive force was intended or not." *Gordon*, 434 S.W.3d at 593; *see also Aguirre*, 995 F.3d at 422 ("Texas courts have repeatedly rejected the argument that intentional conduct by police that also forms the basis of excessive force claims . . . can give rise to cognizable claims under the TCCA.").

Hoffman's alleged intentional act falls under the TTCA sovereign immunity waiver exception no matter how Acosta pleads it. *See Aguirre*, 995 F.3d at 422 (affirming denial of TTCA claim because plaintiff's "negligent use of handcuffs" claim was based on the officers' use of intentional conduct and thus was an intentional tort claim barred under the TTCA); *Petta*, 44 S.W.3d at 580 (finding that plaintiff's negligent training claim was barred under the TTCA because it was based on the same intentional conduct as her assault and battery claim against the individual officer). Nor can Acosta avoid this bar by pleading negligence in the alternative. Because his negligence claim is based on the same conduct as his excessive force allegations – the alleged slam of a door on his hand – it falls outside the TTCA's limited waiver of sovereign immunity.

Acosta's claims that the County negligently failed to properly train and discipline Hoffman also fail. Such claims do not involve the "use" of tangible property and therefore do not give rise to a claim under the TTCA. *See Goodman*, 571 F.3d at 394 (stating that failure to train or supervise are not proper causes of action under the TTCA because they do not involve the use of tangible property); *TDCJ v. Campos*, 384 S.W.3d 810, 815 (Tex. 2012) (holding that plaintiff's claims of failure to discipline, hire, train, and supervise or otherwise direct employees with regard to sexual harassment and assault did not involve use of tangible property and thus were barred under TTCA); *Petta*, 44 S.W.3d at 580-81 (concluding that claims related to negligent failure to train, instruct, and discipline involved the misuse or non-use of information, which is not tangible property). The TTCA does not waive the County's immunity from these claims. The Court recommends that the District Court grant summary judgment on Acosta's negligence claim.

**B. Failure to Accommodate**

Acosta alleges that the County discriminated against him because of his mental disability – PTSD – by denying his requests for his PTSD medication and CPAP machine, in violation of the ADA and the Rehabilitation Act. The County argues that it is entitled to summary judgment on this claim because Acosta has not shown a prima facie case of discrimination.

**1. ADA and Rehabilitation Act**

Title II of the ADA, 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, prohibit public entities such as county jails from discriminating against or denying services or benefits to disabled individuals in their custody. *Smith v. Harris Cnty., Tex.*, 956 F.3d 311, 317 (5th Cir. 2020). Services and benefits include medical services to prisoners and pretrial detainees. *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998). To establish a prima facie case of disability discrimination under either the ADA or the Rehabilitation Act, a plaintiff must demonstrate:

> (1) that he is a qualified individual within the meaning of the ADA;
> (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability.

*Id.* (quoting *Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 671-72 (5th Cir. 2004)).[15] Besides prohibiting disability-based discrimination, the ADA and the Rehabilitation Act impose on public entities an affirmative obligation to make reasonable accommodations for disabled individuals. *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005). An accommodation is reasonable if "it does not impose undue financial or administrative burdens or 'fundamentally alter

---

[15] "By design, the 'remedies, procedures, and rights' applicable to Section 504 of the Rehabilitation Act, i.e., the rights, remedies, and procedures available under Title VI, are also applicable to Title II of the ADA. The close relationship between Section 504 of the Rehabilitation Act and Title II of the ADA means that precedents interpreting either law generally apply to both." *Smith v. Harris Cnty.*, 956 F.3d at 317 (quoting 42 U.S.C. § 12133) (citation omitted).

the nature of the service, program or activity.'" *Smith v. Harris Cnty.*, 956 F.3d at 317 (quoting 28 C.F.R. § 35.130(b)(7)).

To succeed on a failure-to-accommodate claim, a plaintiff must prove that (1) he is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered entity; and (3) the entity failed to make reasonable accommodations. *Id.* "Plaintiffs ordinarily satisfy the knowledge element by showing that they identified their disabilities as well as the resulting limitations to a public entity or its employees and requested an accommodation in direct and specific terms." *Id.* When a plaintiff does not request an accommodation in this manner, he can prevail only by showing that the disability, resulting limitation, and necessary reasonable accommodation were "open, obvious, and apparent" to the entity's relevant agents. *Windham v. Harris Cnty., Tex.*, 875 F.3d 229, 237 (5th Cir. 2017) (citation omitted). "Well-understood and outwardly visible disabilities," such as "blindness, deafness, or being wheelchair-bound," are examples of open and obvious disabilities. *Id.*

Even when plaintiffs successfully prove a disability discrimination or failure-to-accommodate claim, they may only recover compensatory damages on a showing of intentional discrimination. *Smith v. Harris Cnty.*, 956 F.3d at 318. For a failure-to-accommodate claim, intentional discrimination requires at least actual knowledge that an accommodation is necessary; deliberate indifference is insufficient. *Id.*[16]

## 2.  Analysis

The County does not dispute that Acosta has a qualifying disability under the ADA (PTSD) and that he did not receive his prescription medication or CPAP machine while he was in custody.

---

[16] Acosta argues that the County violated the ADA and Rehabilitation Act by deliberate indifference to his medical needs. Dkt. 121 at 27-28. Besides being insufficient to state a claim under either statute, the District Court dismissed Acosta's deliberate indifference to medical needs claim against the County. Dkt. 79.

But the County asks the Court to grant summary judgment on Acosta's failure to accommodate claim because:

> (1) Acosta did not assert any limitations related to a disability during his short time as a detainee in the Williamson County Jail,
>
> (2) Acosta's alleged limitations were not open and obvious, and
>
> (3) the County did not discriminate against him by reason of his disability when he did not receive his non-life-sustaining prescription medications or a CPAP machine.

Dkt. 115 at 30. The Court is not persuaded by the County's first two arguments, but agrees that Acosta has not come forward with sufficient evidence to show that he was denied benefits "by reason of his disability." *Smith*, 956 F.3d at 317.

The County asserts that Acosta was not provided his prescription medications and CPAP machine because the jail officers were following the County's regulations, policies, and practices. The County contends it was following the Medical Services to be Provided policy, which states:

> If an inmate or outside source informs a staff member that the inmate needs necessary prescribed medications and the medications are not with the inmate, the following steps will be followed.
>
> A. Inform the inmate that the medication needs to be brought to the jail in their prescription container.
>
> B. The medical officer will complete an intake of the medications upon their arrival. The intake will include:
>
> C. Identify the person delivering medication
>
> D. Verify the prescriptions
>
> E. Identify and record the amounts of prescription received
>
> F. Obtain the prescribing physicians name and telephone. Call the physician and verify the medication, dosage, and patient information
>
> G. Obtain any other information available from the delivering person. To include any known food or drug allergies
>
> H. Log the receipt of the medication and set up for distribution to the inmate according to established protocol.

Dkt. 115-9 at 4-5.

In his deposition, Lieutenant Wheless, the head supervisor of the Williamson County Sheriff's Office Medical Department, described the County's prescription medication process for inmates whose medications are delivered to the jail at night:

> Q. Okay. And I also saw that -- do you guys make calls to physician's offices to verify prescription information for detainees?
>
> A. We do.
>
> Q. Okay. And is that done in each case, or -- or what's the practice there?
>
> A. So generally, those calls are made during the time when the doctor will be available telephonically. So those are generally done, if you're talking about outside doctors to confirm medications or something like that, that would be --
>
> Q. Right. So do you --
>
> A. -- done --
>
> Q. Okay.
>
> A. -- during normal business hours.
>
> Q. Okay. And so are you actually calling doctor's offices to confirm prescription medication for the detainee, or are you calling the pharmacist?
>
> A. We're calling the pharmacist actually.
>
> Q. Okay.
>
> A. And -- occasionally a doctor's office.
>
> Q. Okay. I got you. So what happens in the case if the -- if it's -- if the pharmacist has gone home for the day, and they close up shop?
>
> A. So if it's outside normal business hours --
>
> Q. Uh-huh.
>
> A. -- that person -- there would be no call made until the following day because the -- the -- all of the issues that come in the jail, the intake issues, are separated between if something is emergent or if something is chronic. If it's emergent, it goes to the emergency room where a real doctor on real time can handle it. If it's a nonemergent issue, it -- it can wait until the following day.
>
> Q. Okay. But sometimes while in the jail and during your shift, someone, who may have processed in, in a nonemergent condition, may suddenly develop a condition that is emergent, correct?
>
> A. For sure.

Q. Okay. And if that were to happen to that individual, medical care should be rendered to them immediately?

A. And it is.

Q. Okay, all right. And so if the pharmacist isn't called until the next day, the medications are just remain -- they just remain pending confirmation until the pharmacist can confirm the prescription; is that correct?

A. That's correct, unless -- unless the medications are brought with the inmate.

Wheless Tr. at 30:1-32:1, Dkt. 115-13 at 4. Wheless also testified that Williamson County Jail does not have CPAP machines, and if a pretrial detainee needs one, a family member must bring it. *Id.* at 36:9-20, Dkt. 115-13 at 5; Dkt. 115 at 5.

The evidence shows that Acosta's wife delivered Acosta's prescription medications (but not his CPAP machine) to the Williamson County Jail around 2:30 a.m. on May 28, 2021. Dkt. 115-11 at 1:20-1:36; Gibson Tr. at 112:6-12, Dkt. 115-17 at 3. Acosta does not dispute that his wife did not deliver his CPAP machine. Sergeant Gibson testified that none of Acosta's prescription medications were considered "life-sustaining medications" and none were kept in stock at the jail. *Id.* at 112:19-113-1, Dkt. 115-7 at 3-4. Because medical staff at the jail could not verify Acosta's prescription medications with an outside pharmacist or physician at 2:30 a.m. and the medications were not considered life-sustaining, under County policy, medical staff did not give the medications to Acosta. *See* Wheless Tr. at 30:1-32:1, Dkt. 115-13 at 4. Acosta was not given his CPAP machine because his wife did not deliver it to the jail.

Other than Acosta's conclusory testimony that he was experiencing a "PTSD episode" and "severe anxiety attack," Dkt. 34 ¶¶ 19, 21, nothing in the record suggests that Acosta experienced a medical emergency requiring life-sustaining medication. The surveillance video shows that Acosta appeared somewhat agitated while Garza tended to his hand, gesticulating as he talked with several officers, but remained seated. Dkt. 115-4 at 11:52-14:45; Dkt. 115-5 at 0:00-4:17. Garza stated that after he treated Acosta's finger, Acosta "thanked [Garza] for assisting him." Dkt. 115-

7 at 3. It is not apparent from the record that Acosta experienced a PTSD episode, severe anxiety attack, or any significant psychological distress.

Similarly, the approximately three-minute recording of Acosta's phone call to his wife reveals him talking to her in a largely controlled manner and asking her to bring him his medications and CPAP machine. Dkt. 115-12. After Acosta called his wife, he was moved to the infirmary without incident. Dkt. 115-6. The next morning, Acosta called his wife for a second time and again talked to her in a calm manner. Dkt. 115-11.

Wheless testified that he was surprised Acosta filed this suit because when he evaluated Acosta a few hours later, just before his release: "He left very happy, gave me a thumbs up when he left the department, when . . . he was bonded out. He seemed to be very, very content. My interaction with him was very pleasant." Wheless Tr. at 48:9-16, Dkt. 115-13 at 8. Wheless also states in his memorandum that Acosta "appeared completely calm and respectful." Dkt. 115-8 at 2.

Acosta submits no competent summary judgment evidence that County employees failed to provide him with his PTSD medications or CPAP machine "by reason of his disability" and not because of standard County policy on dispensing medications and CPAP machines.[17] Nor does he offer any evidence that he and other pretrial detainees with mental disabilities were treated

---

[17] *See Austin v. City of Pasadena, Tex.*, 74 F.4th 312, 334 (5th Cir. 2023) (affirming summary judgment when pretrial detainee failed to show disability discrimination; evidence showed that officers' handling of plaintiff's epileptic seizure "arose from their desire to establish physical control over [plaintiff] in order to achieve a safe environment for emergency medical personnel to provide necessary care" rather than discrimination); *Patrick v. Martin*, No. 2:16-CV-216-D-BR, 2020 WL 4040969, at *46 (N.D. Tex. July 16, 2020) (holding that plaintiffs failed to show intentional discrimination under ADA and Rehabilitation Act where there was evidence that denial of antipsychotic medication was based on compliance issues and doctor's diagnosis, not because of inmate's disability); *Williamson v. Larpenter*, No. 19-254, 2019 WL 3719761, at *14 (E.D. La. July 15, 2019) (finding that prison officials did not discriminate against plaintiff "by reason of his disability" in denying him prescription medications based on jail regulations), *R. & R. adopted*, 2019 WL 3718135 (E.D. La. Aug. 7, 2019); *Hundall v. Univ. of Texas at El Paso*, No. EP-13-CV-00365-DCG, 2014 WL 12496895, at *10 (W.D. Tex. Feb. 21, 2014) (finding that plaintiff did not show discrimination because of plaintiff's disability when he was denied access to a locked classroom where evidence showed classrooms were locked "as a matter of policy" because of general theft concerns).

differently from non-disabled pretrial detainees regarding distribution of medications or CPAP machines. Because there is no evidence that Acosta was treated differently because of his disability, he has not established a claim under the ADA or Rehabilitation Act. This Magistrate Judge recommends that the District Court grant summary judgment to the County on those claims.

## VI.    Motion for Leave to Amend

The amended pleading deadline expired on September 30, 2022. Dkt. 72. Acosta now seeks leave to file a third amended complaint to assert an assault and battery claim against the County. Defendants oppose leave to amend, contending that Acosta has had multiple opportunities to plead his case and any amendment would be futile. The Court agrees.

Rule 16(b) governs amendment of pleadings after a scheduling order deadline has expired. *S & W Enters. v. Southtrust Bank of Ala., NA*, 315 F.3d 533, 536 (5th Cir. 2003). Under Rule 16(b)(4), a scheduling order "may be modified only for good cause and with the judge's consent." The good cause standard requires a showing that "the deadlines cannot reasonably be met despite the diligence of the party needing the extension." *S & W Enters.*, 315 F.3d at 535. If the movant shows good cause, "the more liberal standard of Rule 15(a)" applies. *Id.*

Acosta does not show good cause for the amendment, but even if he had, the Court would deny leave as futile. "Futility is determined under Rule 12(b)(6) standards, meaning an amendment is considered futile if it would fail to state a claim upon which relief could be granted." *Legate v. Livingston*, 822 F.3d 207, 211 (5th Cir. 2016). Acosta attempts to amend his complaint for the third time to add an assault and battery claim against the County. As stated, intentional tort claims are barred under TTCA § 101.057(2).

The Court also finds that Acosta has had multiple opportunities to cure and failed. *Stevens v. St. Tammany Par. Gov't*, 17 F.4th 563, 575 (5th Cir. 2021). Defendants filed two previous motions to dismiss, and Acosta has been permitted to amend his complaint twice. At some point, a plaintiff

"has pled his best case." *Hale v. King*, 642 F.3d 492, 503 (5th Cir. 2011); *see also Brewster v. Dretke*, 587 F.3d 764, 768 (5th Cir. 2009) ("Granting leave to amend is not required, however, if the plaintiff has already pleaded his 'best case.'"). Amendment at this stage of the case would cause undue delay, and Acosta presents no facts or legal arguments showing that his proposed amendment would not be futile. *Stevens*, 17 F.4th at 575. For these reasons, Acosta's motion for leave to file a third amended complaint is denied.

## VII.    Recommendation and Order

This Magistrate Judge **RECOMMENDS** that the District Court **GRANT** Defendants Williams County, Texas, and Alyssa Hoffman's Motion for Summary Judgment (Dkt. 115) and enter a Final Judgment for Defendants.

Plaintiff's Opposed Motion for Leave to Amend Complaint (Dkt. 119) is **DENIED**.

**IT IS FURTHER ORDERED** that this case be **REMOVED** from the Magistrate Court's docket and **RETURNED** to the docket of the Honorable District Court.

## VIII.    Warnings

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report and, except on grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C.

§ 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

    **SIGNED** on August 21, 2023.

                                                                     
SUSAN HIGHTOWER
UNITED STATES MAGISTRATE JUDGE