# United States Court of Appeals for the Fifth Circuit

No. 23-50777

United States Court of Appeals
Fifth Circuit

**FILED**

August 15, 2024

Lyle W. Cayce
Clerk

BERNARDO ACOSTA,

*Plaintiff—Appellant,*

*versus*

WILLIAMSON COUNTY, TEXAS; ALYSSA HOFFMAN,

*Defendants—Appellees.*

_____

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:21-CV-615

_____

Before KING, STEWART, and HIGGINSON, *Circuit Judges.*

J U D G M E N T

This cause was considered on the record on appeal and the briefs on file.

IT IS ORDERED and ADJUDGED that the judgment of the District Court is AFFIRMED.

IT IS FURTHER ORDERED that Appellant pay to Appellees the costs on appeal to be taxed by the Clerk of this Court.

The judgment or mandate of this court shall issue 7 days after the time to file a petition for rehearing expires, or 7 days after entry of an order denying a timely petition for panel rehearing, petition for rehearing en banc, or motion for stay of mandate, whichever is later. See Fed. R. App. P. 41(b). The court may shorten or extend the time by order. See 5th Cir. R. 41 I.O.P.



Certified as a true copy and issued
as the mandate on **Sep 06, 2024**

Attest:

Clerk, U.S. Court of Appeals, Fifth Circuit

# United States Court of Appeals
# for the Fifth Circuit

---

No. 23-50777

---

United States Court of Appeals
Fifth Circuit

**FILED**

August 15, 2024

Lyle W. Cayce
Clerk

BERNARDO ACOSTA,

*Plaintiff—Appellant*,

*versus*

WILLIAMSON COUNTY, TEXAS; ALYSSA HOFFMAN,

*Defendants—Appellees*.

---

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:21-CV-615

---

Before KING, STEWART, and HIGGINSON, *Circuit Judges*.

PER CURIAM:[*]

On the evening of May 27, 2021, Plaintiff-Appellant Bernardo Acosta was booked at Williamson County Jail after being arrested on suspicion of driving while intoxicated. He spent the night in jail and bonded out the next morning. Acosta claims that during his detention, Williamson County Jail Officer Alyssa Hoffman deliberately slammed a holding cell door on his finger around midnight. He further claims that Williamson County officers

---

[*] This opinion is not designated for publication. *See* 5TH CIR. R. 47.5.

withheld his medications for post-traumatic stress disorder and failed to provide him with a CPAP machine for the evening. Acosta brought claims under 42 U.S.C. § 1983, the Americans with Disabilities Act, the Rehabilitation Act, and Texas tort law. The district court dismissed Acosta's § 1983 municipal liability claims against Williamson County and granted summary judgment for Defendants-Appellees Hoffman and Williamson County on all remaining claims. We AFFIRM.

## I.

## A.

Plaintiff-Appellant Bernardo Acosta is an Air Force veteran who suffers from post-traumatic stress disorder ("PTSD"), for which he has been prescribed several medications. Acosta also has sleep apnea, and he sleeps with the assistance of a CPAP machine.[1]

At around 8:40 p.m. on May 27, 2021, Acosta was arrested in Williamson County, Texas, on suspicion of driving while intoxicated. Acosta was booked at Williamson County Jail for pretrial detention. At around 9:39 p.m., Acosta completed a medical intake with Medical Sergeant Ariel Gibson. During the intake, Acosta informed Gibson that he suffers from mental illness, including PTSD, and that he takes prescription medications. However, in their depositions, neither Acosta nor Gibson could recall Acosta informing Gibson that he would need any of those medications immediately. Furthermore, according to Gibson, Acosta appeared upset about being arrested, but he was not exhibiting signs of a mental health crisis at that time.

---

[1] A CPAP (continuous positive airway pressure) machine delivers air through the user's mouth and/or nose during sleep.

At some point following his booking, Acosta was placed in a holding cell, along with several other detainees. Around midnight, County Jail Officer Alyssa Hoffman approached the holding cell to give a blanket to a detainee. Acosta and Hoffman have differing accounts of the events that transpired. Each party's version of the events is described below:

Acosta recalls "pleading" with Hoffman that he needed his medications and CPAP machine. He also requested a phone call. According to Acosta, Hoffman replied that Acosta could use the phone inside the holding cell to request that someone bring his medications to the jail. But because he "wasn't comfortable" with using the phone in the holding cell, Acosta continued to request to use the phone in the booking area. Hoffman repeatedly denied these requests and began to close the cell door. Hoffman shut the cell door while Acosta's left hand was in the door jamb, resulting in an injury to Acosta's left ring finger. Acosta speculates that Hoffman clearly could have seen that his hand was in the door jamb, though he does not recall Hoffman expressly indicating that she knowingly closed the door on his hand. Acosta denies providing any resistance to Hoffman closing the door.

Hoffman, in her deposition, admitted that Acosta told her that he needed his medications and CPAP machine. Hoffman responded that the jail did not have his medications, but that Acosta could call someone to have his belongings brought to the jail. According to Hoffman, Acosta replied that "he did not want to call his wife and make her wake up his kids just to bring him medication." Hoffman then told Acosta that she was not "going to keep giving [him] the same information," and she informed him that she was going to close the door. Acosta purportedly responded by placing his right hand and right foot on the door to block it from shutting. Because Acosta was providing this resistance, Hoffman pushed her hip and shoulder against the door to ensure that it closed. Hoffman claims that she did not see Acosta's left hand in the door jamb.

The record contains a video of the incident between Acosta and Hoffman. The camera is located in a common area, across the room from the holding cell, and the footage only shows the outside of the door (i.e., Hoffman's side). At around 12:05 a.m., Hoffman approaches the door with a blanket. After initially walking away, Hoffman circles back to the cell. She appears engaged in conversation, presumably with Acosta, for about two minutes. During the conversation, Hoffman stands totally still and holds the door open; nothing in her body language indicates that she is acting in a combative manner. Hoffman then closes the door slowly for two seconds. Once the door appears closed or nearly closed, Hoffman secures the door by keeping her left hand on the door, and then pushing the door with her left hip and left shoulder. Hoffman takes approximately three seconds to secure the door in this manner. After securing the door, Hoffman walks away from the holding cell without taking any further notice of Acosta.

About nine seconds after Hoffman walks away, Acosta raises his left hand near the holding cell window. For the next three minutes, Acosta unsuccessfully attempts to get officers' attention. Acosta wipes blood on the holding cell window to alert nearby correctional officers, and he claimed in his deposition that a few officers saw him and were "chuckling."[2] However, in the video recording, it is not clear that any officers took notice of Acosta. Finally, after about three minutes, a correctional officer walks by the holding cell and notices that Acosta needs medical attention.

About four minutes later, several officers, including Medical Sergeant Gibson and Medical Officer Jose Garza, arrive at the holding cell to tend to Acosta's injury. Acosta clearly appears agitated, but the situation appears to

---

[2] The blood is not visible in the video recording, but it is undisputed that Acosta smeared his blood on the window around this time.

be under control, and Acosta sits down outside the holding cell to receive treatment for his finger. For the next four minutes, Garza examines, cleans, and bandages Acosta's finger. Acosta receives treatment without resistance, though during this period he appears to speak in a frustrated manner with the correctional officers at the scene.

The accounts in the record of the extent of Acosta's injury and the treatment provided to his finger are consistent. Gibson testified that Acosta's finger "wasn't bleeding profusely," and that it had a small laceration that did not require stitches. There were no bones protruding, and Acosta "still had full range of motion in his hand and his fingers."[3] Garza treated Acosta's finger by cleaning the wound and applying gauze to stop the bleeding.

After receiving treatment for his finger, Acosta called his wife using the phone in the booking area. During this call, Acosta asked his wife to bring his medications and CPAP machine to the jail. Acosta's wife delivered his medications to the jail sometime after 2:00 a.m., but she did not bring his CPAP machine. However, according to the jail's medical staff, Acosta was not provided his medications after delivery because Acosta's medications are not considered "life sustaining," (i.e., prescribed for chronic disabilities or conditions such as seizures, hypertension, or diabetes). Instead, as Medical Lieutenant Douglas Wheless explained in his deposition, Acosta would have to wait until jail staff could verify his prescriptions with an outside physician or pharmacist, which could not feasibly occur until normal business hours

---

[3] With the benefit of hindsight, we know that Acosta appears to have suffered a fracture at the tip of his ring finger. But the record does not contain indication that any officers knew, or should have known, that the tip of Acosta's finger was fractured. Regardless, the video clearly indicates that Acosta received prompt medical care and was attended to by several officers, which plainly contradicts the operative complaint's allegations that Acosta "pleaded for help and received none for an extended period of time," and that he was "denied basic medical care."

(i.e., the next morning), unless he were to experience a medical emergency requiring hospitalization. This explanation is consistent with Williamson County's written policies, which state that jail staff is to "[c]all the [prescribing] physician and verify the medication, dosage, and patient information" before distributing medications that are brought to the jail by an outside source.

After Acosta called his wife in the booking area, he was taken to a single cell for one detainee. At around 9:00 a.m. the next morning, Acosta met with Lieutenant Wheless for a follow-up evaluation. According to Wheless's deposition testimony, Acosta's finger did not appear to be visibly injured, but Wheless offered Acosta a saline solution and hydrogen peroxide. Wheless claims that Acosta declined this treatment, since he was "fixing to bond out." Acosta ultimately never received his medications or a CPAP machine, but he purportedly bonded out of jail shortly after speaking with Wheless in the morning.

After leaving the jail, Acosta received an x-ray showing that his bone was fractured at the tip of his finger. During his deposition, Acosta reported that he continues to feel numbness and discomfort in his injured finger.

## B.

Acosta filed a lawsuit against Williamson County and several "Unknown Jailers" in federal court on July 12, 2021. In his operative second amended complaint, Acosta raised municipal liability claims against Williamson County under 42 U.S.C. § 1983, alleging that the County's policies and/or practices resulted in violations of Acosta's constitutional rights under the Fourth, Eighth, and Fourteenth Amendments. Acosta further alleged that Williamson County violated his rights under the Americans with Disabilities Act ("ADA") and Rehabilitation Act by failing to accommodate his disabilities during his detention. Acosta asserted claims

of negligence and gross negligence against Williamson County and individual officers Alyssa Hoffman, Jose Garza, Ariel Gibson, Ruben Vela, and Fernando Morales for injuring Acosta's finger and then failing to provide him with adequate care. Finally, Acosta asserted against Hoffman claims of excessive force, assault, and battery.

After multiple defendants filed motions to dismiss, the district court dismissed several of Acosta's claims, including his § 1983 municipal liability claims against Williamson County. Following these dismissals, the claims that remained before the court were: (1) Acosta's ADA, Rehabilitation Act, and negligence claims against Williamson County; and (2) Acosta's excessive force, assault, and battery claims against Hoffman.

On May 10, 2023, Williamson County and Hoffman jointly moved for summary judgment on all remaining claims. On August 21, 2023, the magistrate judge recommended granting the motion for summary judgment in full. On September 1, 2023, Acosta filed objections to the magistrate judge's report and recommendations. Notwithstanding these objections, the district court adopted the magistrate judge's report and recommendations. The district court closed the case on October 10, 2023, and a notice of appeal followed.

## II.

We review grants of summary judgment *de novo*. *Moore v. LaSalle Mgmt. Co.*, 41 F.4th 493, 502 (5th Cir. 2022). Summary judgment is appropriate if the movant shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute regarding a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We view all evidence and draw all justifiable inferences in favor of the

nonmovant. *Moore*, 41 F.4th at 502. That said, "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence.'" *Delta & Pine Land Co. v. Nationwide Agribusiness Ins.*, 530 F.3d 395, 399 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)).

"When opposing parties tell two different stories, one of which is blatantly contradicted" by video evidence, courts are to "view[] the facts in the light depicted by the videotape." *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007). But this standard "is a demanding one: a court should not discount the nonmoving party's story unless the video evidence provides so much clarity that a reasonable jury could not believe his account." *Darden v. City of Fort Worth*, 880 F.3d 722, 730 (5th Cir. 2018).

Defendant-Appellee Hoffman has asserted the defense of qualified immunity.[4] "A qualified immunity defense alters the usual summary judgment burden of proof." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). "Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Id.* To overcome the defense of qualified immunity, a plaintiff must establish that: (1) the official violated the plaintiff's statutory or constitutional right; and (2) the right was clearly established at the time of the violation. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). For a right to be clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that

---

[4] Acosta argues that the doctrine of qualified immunity should be abolished. However, "'[a]s middle-management circuit judges,' we cannot overrule the Supreme Court." *See Rogers v. Jarrett*, 63 F.4th 971, 981 (5th Cir. 2023) (Willett, J., concurring) (quoting *Sims v. Griffin*, 35 F.4th 945, 951 n.17 (5th Cir. 2022)).

right." *Brown*, 623 F.3d at 253. Although this does not mean that "a case directly on point" is required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741.

## III.

We begin with Acosta's excessive force claim against Officer Hoffman brought pursuant to § 1983. Acosta claims that "Hoffman knowingly and intentionally used her entire body weight, with force, in slamming the door, to which she had full control of, on [Acosta's] hand, causing him serious bodily injury." Hoffman, on the other hand, insists that she did not intend to close the cell door on the tip of Acosta's finger.

"Pretrial detainees are protected by the Due Process Clause of the Fourteenth Amendment." *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 419 (5th Cir. 2017). In *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), the Supreme Court outlined the proper analytical framework for adjudicating a pretrial detainee's excessive force claim. The Court noted that a Fourteenth Amendment excessive force claim contains "two separate state-of-mind questions." *Id.* at 395. "The first concerns the defendant's state of mind with respect to his physical acts—*i.e.*, his state of mind with respect to the bringing about of certain physical consequences in the world." *Id.* "The second question concerns the defendant's state of mind with respect to whether his use of force was 'excessive.'" *Id.*

Addressing this first question, the Court held that "the defendant must possess a purposeful, a knowing, or possibly a reckless state of mind" for a plaintiff to establish a viable excessive force claim under the Fourteenth Amendment. *Id.* at 396. As the Court explained, "liability for *negligently* inflicted harm is categorically beneath the threshold of constitutional due process." *Id.* (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 849

(1998)); *see also Daniels v. Williams*, 474 U.S. 327, 331 (1986) ("Historically, this guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property."). Therefore, a pretrial detainee can succeed on an excessive force claim where the defendant's "use of force is deliberate—*i.e.*, purposeful or knowing." *Kingsley*, 576 U.S. at 396.

Addressing the second question, the Court held that "[i]n deciding whether the force deliberately used is, constitutionally speaking, 'excessive,'" courts should apply an objective reasonableness standard. *Id.* at 396–97. This determination of objective reasonableness must be made "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* at 397. While the Court noted that objective reasonableness turns on the facts and circumstances of each particular case, it provided a few relevant considerations:

> [T]he relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.* at 397.

In sum, a Fourteenth Amendment excessive force inquiry under *Kingsley* has two steps. At step one, courts must determine whether the defendant's use of force was deliberate. If the use of force was deliberate, then at step two, courts must determine whether the defendant's use of force was objectively reasonable, considering the specific circumstances of the case.

Acosta's case primarily hinges on *Kingsley* step one. If Acosta's version of the facts is accepted as true, i.e., Hoffman deliberately slammed a cell door on the hand of a non-resisting detainee, such a use of force would have violated Acosta's clearly established rights. We have held that a broken finger is a cognizable injury in an excessive force case, and noted that "as long as a plaintiff has suffered some injury, even relatively insignificant injuries . . . will prove cognizable when resulting from an officer's unreasonably excessive force." *Scott v. White*, 810 F. App'x 297, 299, 301 (5th Cir. 2020) (quoting *Sam v. Richard*, 887 F.3d 710, 713 (5th Cir. 2018)). And, as Acosta notes, it was clearly established at the time of the incident that "violently slamming or striking" a non-resisting individual constitutes excessive force. *See Darden*, 880 F.3d at 733.[5]

However, if Hoffman did not deliberately slam the cell door on Acosta's finger, then Acosta's excessive force claim fails at *Kingsley* step one. It is true, as Acosta notes repeatedly, that Hoffman did potentially admit to knowingly applying *some* force to Acosta; Hoffman consistently testified that Acosta had his right hand and right foot on the door while it closed. But a Fourteenth Amendment excessive force claim is analyzed under an objective reasonableness standard that takes into account "what the [defendant] knew at the time." *Kingsley*, 576 U.S. at 397. And the Due Process Clause is not implicated by "an official causing unintended injury to life, liberty or property." *Davidson v. Cannon*, 474 U.S. 344, 347 (1986). Therefore, we find that if Hoffman did not know that Acosta's left hand was in the door jamb,

---

[5] Though *Darden*, and the cases it cites, are excessive force cases finding violations of the Fourth Amendment, this court has held that constitutional principles articulated in Fourth Amendment excessive force cases (e.g., the unlawfulness of continuing to apply force to a restrained and subdued subject), can clearly establish the rights of pretrial detainees in Fourteenth Amendment excessive force cases. *See Fairchild v. Coryell County*, 40 F.4th 359, 368 (5th Cir. 2022).

No. 23-50777

securing the cell door using her hip and shoulder would not be objectively unreasonable, nor would it constitute a clearly established violation of Acosta's Fourteenth Amendment rights.[6]

In light of this analysis, Acosta's case turns on whether Hoffman's act of closing the door on Acosta's finger was deliberate or accidental. Therefore, we must determine whether there is sufficient evidence for a jury to conclude that Hoffman acted deliberately.

There are essentially three sources of information in the record related to this incident: Acosta's testimony, Hoffman's testimony, and the video of the incident. The evidence from Acosta's testimony that the act was deliberate is essentially speculative; Acosta testified that "[Hoffman] clearly could have seen [his] hand there [in the door jamb], cause . . . [his] hand is rather large." Acosta's testimony also indicates that Hoffman may have been frustrated with Acosta because of his repeated requests to use the phone in the booking area.

Hoffman, on the other hand, testified that she did not see Acosta's left hand in the door jamb. Hoffman claims that Acosta pressed against the door with his *right* hand and right foot, which is why she used her body weight to secure the door.

The video of the incident, frankly, does not help Acosta's case. It is difficult to find *any* details in the video that support Acosta's claim that

_____

[6] If Hoffman did not know that Acosta's left hand was in the door jamb, and, per *Hoffman's* version of the facts, Acosta provided resistance by putting his right hand and right foot on the door, Hoffman's brief use of force in securing the door to overcome this resistance would not be objectively unreasonable. If Hoffman did not know that Acosta's left hand was in the door jamb, and, per *Acosta's* version of the facts, Acosta did *not* provide any resistance against the door, then any force exerted on Acosta would have been entirely unintentional, and, accordingly, no constitutional violation would have occurred.

Hoffman deliberately slammed the cell door on his finger. For instance, nothing in Hoffman's body language during her two-minute conversation with Acosta indicates that Hoffman was preparing to engage in a deliberate strike; she remained totally still the entire time, and the interaction appeared noncombative. Furthermore, if Hoffman deliberately shut the cell door on Acosta's finger, one might expect the video to show Hoffman slamming the door quickly. But Hoffman closed the door—which was only partially open to begin with—quite slowly over the course of five seconds. And the "slamming" portion of the incident, in which Hoffman briefly placed her body weight against the door with her shoulder and hip, lasted three seconds. This incident failed to garner the attention of a detainee sitting in the common area, just a few meters away from the holding cell. And nothing in Hoffman's body language after the incident, in which she casually walked back to the processing area without taking any further notice of Acosta, indicates an awareness that she had just injured Acosta's finger.

This is not to say that Acosta's version of events is "blatantly contradicted" by the video. *Scott*, 550 U.S. at 380. The video does show Hoffman securing the door with her body weight, and the camera is too far away from the incident to definitively determine whether Hoffman did, in fact, see Acosta's hand in the door jamb. But even viewing the video in the light most favorable to Acosta, we cannot find in this footage any details that lend credence to Acosta's claim that Hoffman "deliberately and callously" struck his finger.

In sum, viewing the evidence in Acosta's favor, we must assume that: (1) Acosta was not providing resistance against the door; (2) Acosta and Hoffman had a somewhat contentious conversation regarding Acosta's ability to use the phone in the booking area; and (3) Hoffman used her body weight to secure the door. For Acosta's excessive force claim to survive summary judgment, we must be able to conclude, based on these premises,

that a reasonable jury could find by a preponderance of the evidence that Acosta is entitled to a verdict in his favor. *See Anderson*, 477 U.S. at 252.

We cannot draw such a conclusion here—there is insufficient evidence to elevate Acosta's claim of a deliberate attack beyond speculation. We have noted that "[s]ummary judgment is appropriate where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant," and this principle applies here. *See Armstrong v. City of Dallas*, 997 F.2d 62, 67 (5th Cir. 1993); *see also Anderson*, 477 U.S. at 249–50 (noting that summary judgment is appropriate where the evidence presented is "merely colorable" or "not significantly probative"). We find that the summary judgment evidence, which notably includes a video showing Hoffman during the entire incident at issue, does not support a finding that Hoffman deliberately struck Acosta's finger. Because there is insufficient evidence for a reasonable jury to conclude that Hoffman violated Acosta's constitutional rights, we AFFIRM the district court's grant of summary judgment for Hoffman on Acosta's Fourteenth Amendment excessive force claim.

## IV.

We turn next to Acosta's ADA/Rehabilitation Act claim. Acosta claims that there are genuine issues of material fact as to the lack of reasonable accommodations provided for him at Williamson County Jail, despite County officers' knowledge of his disabilities and medical needs.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The Rehabilitation Act protects any "otherwise qualified individual with a disability in the United States" from being "excluded from the

participation in, be[ing] denied the benefits of, or be[ing] subjected to discrimination under any program or activity receiving Federal financial assistance," including any instrumentality of a local government. 29 U.S.C. § 794. "The remedies, procedures, and rights available under the Rehabilitation Act parallel those available under the ADA." *Cadena v. El Paso County*, 946 F.3d 717, 723 (5th Cir. 2020). Thus, this court "equate[s] liability standards under [the Rehabilitation Act] and the ADA." *D.A. ex rel. Latasha A. v. Hous. Indep. Sch. Dist.*, 629 F.3d 450, 453 (5th Cir. 2010).

To establish a *prima facie* case under either statute, a plaintiff must demonstrate:

> (1) that he is a qualified individual within the meaning of the ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability.

*Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 671–72 (5th Cir. 2004).

"In addition to their respective prohibitions of disability-based discrimination, both the ADA and the Rehabilitation Act impose upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals." *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005). A requested accommodation is reasonable if "it does not impose undue financial or administrative burdens or 'fundamentally alter the nature of the service, program, or activity.'" *Cadena*, 946 F.3d at 724 (quoting 28 C.F.R. § 35.130(b)(7)). "To succeed on a failure-to-accommodate claim, a plaintiff must prove: (1) he is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered entity; and (3) the entity failed to make reasonable

accommodations." *Ball v. LeBlanc*, 792 F.3d 584, 596 n.9 (5th Cir. 2015). "Plaintiffs ordinarily satisfy the knowledge element by showing that they identified their disabilities as well as the resulting limitations to a public entity or its employees and requested an accommodation in direct and specific terms." *Smith v. Harris County*, 956 F.3d 311, 317 (5th Cir. 2020). "When a plaintiff fails to request an accommodation in this manner, he can only prevail by showing that 'the disability, resulting limitation, and necessary reasonable accommodation' were 'open, obvious, and apparent' to the entity's relevant agents." *Windham v. Harris County*, 875 F.3d 229, 237 (5th Cir. 2017) (quoting *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 165 (5th Cir. 1996)).

For a plaintiff to recover compensatory damages for an ADA claim, he must also prove that he was subjected to intentional discrimination. *Cadena*, 946 F.3d at 724. "This court has hesitated to delineate the precise contours of the standard for showing intentionality, . . . [b]ut the cases to have touched on the issue require something more than deliberate indifference, despite most other circuits defining the requirement as equivalent to deliberate indifference." *Id.* (internal quotations omitted). "If a defendant attempts to accommodate a disability, then intentional discrimination requires knowledge 'that further accommodation was necessary.'" *Smith*, 956 F.3d at 319 (quoting *Cadena*, 946 F.3d at 726).

Acosta's ADA/Rehabilitation Act claim has two components. First, Acosta claims that Williamson County violated the ADA/Rehabilitation Act by failing to provide him with his prescription medications for PTSD. Second, he claims that Williamson County violated the ADA/Rehabilitation Act by failing to provide him access to a CPAP machine during his night at the jail.

Even assuming that Acosta was a qualified individual with a disability and that Williamson County officers knew of Acosta's disability and related

limitations, Acosta's ADA/Rehabilitation Act claim fails because the summary judgment evidence does not indicate that officers at Williamson County Jail failed to make *reasonable* accommodations for Acosta. Instead, the record indicates that the officers undertook the practical steps they could achieve—given the circumstances—to ensure that Acosta's needs would be accommodated.

For instance, with respect to Acosta's request for his prescription medications, it is undisputed that Acosta was told that he could call an outside individual to have his medications brought to the jail. Acosta called his wife, who arrived at the jail with his medications sometime after 2:00 a.m. However, because Acosta's medications were not considered "life sustaining" (a description he does not dispute), medical staff followed a seemingly sensible policy of holding off on distributing these medications until the prescriptions could be verified by a physician or pharmacist. And, because it was the middle of the night, verifying Acosta's medications would have to wait until the morning, when his physician or pharmacist could feasibly be reached.[7]

Acosta also claims that Williamson County officers should have administered emergency treatment, since Acosta was experiencing a "manic or [PTSD] episode." While Acosta testified that he may have been

---

[7] Acosta speculates that there may have been a way for medical staff to provide him with his medications immediately. For instance, he notes that physicians are available telephonically 24 hours a day, but that this service was not utilized to verify his prescriptions. But while Lieutenant Wheless testified, in the context of discussing the treatment of Acosta's finger, that physicians are available telephonically 24 hours a day, he did *not* testify that a physician is available 24 hours a day to swiftly verify any prescription for any detainee. Acosta also points to a jail policy indicating that, in some instances, certain inmates may be permitted to self-administer medication. However, in context, it seems relatively clear that this policy is intended to apply only *after* those medications are verified by a physician or pharmacist.

experiencing a PTSD episode when speaking with Hoffman in the holding cell, the district court appears correct in its conclusion that "nothing [else] in the record suggests that Acosta experienced a medical emergency requiring life-sustaining medication" or hospitalization. Even if Acosta was experiencing an emergency PTSD episode, the record does not indicate that Williamson County officers knew or should have known that such an episode was occurring. The officers involved consistently report that Acosta was clearly agitated after his finger was slammed in the cell door, but that he remained lucid and was treated without issue. In other words, there is insufficient evidence to conclude that Acosta requested emergency treatment, or that his need for emergency accommodations was "'open, obvious, and apparent' to the entity's relevant agents." *See Smith*, 956 F.3d at 318 (quoting *Windham*, 875 F.3d at 237).

In sum, even viewing the record in the light most favorable to Acosta, the summary judgment evidence does not indicate that Williamson County officers failed to make a *reasonable* accommodation for Acosta by failing to administer his medications during the middle of the night. Even if Acosta requested for his medications to be provided immediately, the County was "not required to acquiesce to [Acosta's] choice of accommodations merely because [he] requested them." *See Cadena*, 946 F.3d at 725; *see also Wells v. Thaler*, 460 F. App'x 303, 313 (5th Cir. 2012) ("[W]e accord the officials at the [jail] deference in their determination of an appropriate accommodation."). And, even if the Williamson County officers were not as prompt as Acosta desired, under the relevant circumstances—i.e., a request for non-life-sustaining prescription medications in the middle of the night from a detainee who had just been booked—we fail to see how the officers' failure to immediately provide these medications constituted an ADA/Rehabilitation Act violation.

Acosta's claim that Williamson County violated the ADA by failing to provide him with a CPAP machine fares similarly. The issue with this claim, again, is that Williamson County officers seemingly took practical steps to provide Acosta with this accommodation, given the circumstances. They allowed Acosta to call his wife in the booking area, and Acosta requested that she bring his CPAP machine to the jail. While hindsight tells us that Acosta's wife ultimately did not bring the CPAP machine when she dropped off his medications, the jail officers had no reason to believe that this accommodation would be inadequate. *See Smith*, 956 F.3d at 319.

At bottom, the record indicates that Williamson County officers took practical steps to ensure that Acosta's medical needs would be accommodated. Granted, Acosta's needs were not actually accommodated. However, this result is more reflective of the brief length of Acosta's detention—one night—and factors beyond the jail officers' control, rather than the officers' failings. Of course, had Acosta not bonded out the following morning, the jail officers would have had a duty to administer his medications as soon as reasonably possible, and to follow up on the CPAP machine issue from the prior night. Under the circumstances presented here, however, we cannot conclude that Williamson County failed to provide reasonable accommodations, much less intentionally discriminated against Acosta. Accordingly, we AFFIRM the district court's grant of summary judgment for Williamson County on Acosta's ADA/Rehabilitation Act claim.

## V.

We next address Acosta's tort claims. The district court's reasoning in granting summary judgment for Hoffman and Williamson County on Acosta's tort claims is straightforward and amply supported by authority, and Acosta's appellate brief does not clearly articulate how the district court

erred. In our own *de novo* review, we find no error in the district court's holdings, which we review briefly.

Acosta brought assault and battery claims against Hoffman, but these claims are squarely foreclosed by statutory immunity. Namely, the Texas Tort Claims Act ("TTCA") "bars tort claims against government employees when (1) the alleged tort occurred 'within the general scope of that employee's employment' and (2) 'it could have been brought under [the TTCA] against the governmental unit.'" *Espinal v. City of Houston*, 96 F.4th 741, 749 (5th Cir. 2024) (quoting Tex. Civ. Prac. & Rem. Code § 101.106(f)). Here, it is undisputed that this first requirement for immunity is met; Acosta claims that Hoffman "acted in her scope of employment by intentionally, knowingly and recklessly slamming the door on [his] finger out of spite." The second requirement for immunity is also met; although the TTCA does not waive governmental immunity for claims arising out of intentional torts such as assault and battery, *see* Tex. Civ. Prac. & Rem. Code § 101.057(2), the Texas Supreme Court has held that "*any* tort claim . . . 'could have been brought' under the [TTCA] against the government regardless of whether the [TTCA] waives immunity" with respect to it, *Espinal*, 96 F.4th at 749 (quoting *Franka v. Velasquez*, 332 S.W.3d 367, 375, 385 (Tex. 2011)). Therefore, as the district court concluded, Acosta's tort claims against Hoffman are squarely foreclosed by Texas law.

Acosta also brought negligence claims against Williamson County. Because governmental units are immune from suit under Texas law, Acosta bears the burden of establishing that the County's immunity has been waived. *Dall. Area Rapid Transit v. Whitley*, 104 S.W.3d 540, 542 (Tex. 2003); *see also Goodman v. Harris County*, 571 F.3d 388, 394 (5th Cir. 2009) (noting that a county is a "governmental unit"). To establish waiver of immunity, Acosta notes that the TTCA provides that governmental units may be held liable

for injuries "caused by a condition or use of tangible personal or real property." Tex. Civ. Prac. & Rem. Code § 101.021(2).

Acosta's attempts to circumvent the County's immunity fail as a matter of law. First, any claim of negligence arising out of Hoffman's alleged use of excessive force is foreclosed. As noted above, governmental units do *not* waive immunity for claims arising out of intentional torts. Tex. Civ. Prac. & Rem. Code § 101.057(2). And, as the district court noted, "[a] plaintiff cannot avoid a governmental unit's sovereign immunity by pleading an intentional tort claim as a negligence claim." *See Aguirre v. City of San Antonio*, 995 F.3d 395, 422 (5th Cir. 2021) ("[I]ntentional conduct, no matter how it is pled, falls under the TTCA's sovereign immunity waiver exception." (internal quotation omitted)); *id.* ("Texas courts have repeatedly rejected the argument that intentional conduct . . . that also forms the basis of excessive force claims . . . can give rise to cognizable claims under the [TTCA].").

We agree with the district court that Acosta's excessive force claim sounds in intentional tort. Acosta characterizes Hoffman's use of force as intentional, both in his second amended complaint and in his appellate brief. Because Acosta alleges that Hoffman used excessive force, "a claim that arises out of a battery, his pleadings do not state a claim for which governmental immunity has been waived under the [TTCA]." *City of Watauga v. Gordon*, 434 S.W.3d 586, 594 (Tex. 2014).

Acosta's other attempts to establish waiver of the County's liability via § 101.021(2), which requires an injury "caused by a condition or use of tangible personal or real property," are also unsuccessful. For instance, Acosta claims that Williamson County negligently failed to train and discipline Hoffman. In *Texas Department of Criminal Justice-Community Justice Assistance Division v. Campos*, 384 S.W.3d 810, 815 (Tex. 2012), the

Supreme Court of Texas addressed a group of plaintiffs' claims that the defendant government entity "failed to discipline prior inappropriate conduct by . . . employees, failed to properly hire, train, and supervise [officers], and failed to screen, educate, train, supervise, investigate, or otherwise direct employees." The court held that the defendant's immunity was not waived, since the plaintiffs had not alleged that a use of tangible property was involved in any of these alleged failures. *Id.*; *see also Goodman*, 571 F.3d at 394 ("The TTCA is . . . not the appropriate vehicle for claims of negligent failure to train or supervise.").

The same conclusion is warranted in Acosta's case. Acosta repeatedly references the cell door as the tangible property utilized in the County's negligent conduct. But the use of the cell door is only salient with respect to Acosta's excessive force claim; Acosta has not explained how the County's alleged negligence in failing to train or discipline Hoffman involved a use of tangible property. *See Campos*, 384 S.W.3d at 815; *Tex. Dep't of Pub. Safety v. Petta*, 44 S.W.3d 575, 581 (Tex. 2001) (holding that claims against a government entity pertaining to the "misuse or non-use of information" are barred by immunity). Similarly, Acosta's claim that the County was negligent for providing inadequate medical care is also foreclosed, since the Supreme Court of Texas has held that a claim of inadequate medical care does not involve the use of tangible property under the TTCA. *See Tex. Dep't of Corr. v. Herring*, 513 S.W.2d 6, 9 (Tex. 1974).

As noted above, Acosta has not provided any compelling arguments to counter the district court's comprehensive, well-supported conclusions of law on this issue. We therefore AFFIRM the district court's grant of summary judgment for Defendants-Appellees Hoffman and Williamson County on Acosta's state tort claims.

## VI.

Finally, we address the district court's dismissal of Acosta's § 1983 municipal liability claims against Williamson County, which occurred before the summary judgment stage. This court reviews *de novo* the grant of a Rule 12(b)(6) motion to dismiss. *Lampton v. Diaz*, 639 F.3d 223, 225 (5th Cir. 2011). However, when a magistrate judge first issues a report and recommendations, a party is entitled to *de novo* review of proposed findings accepted by the district court only if the party filed timely objections to the report and recommendations. *Quinn v. Guerrero*, 863 F.3d 353, 358 (5th Cir. 2017); *Salts v. Epps*, 676 F.3d 468, 474 (5th Cir. 2012). If the magistrate judge specifically advises the parties that objections must be so filed, and the parties then fail to file objections, we review only for plain error. *Quinn*, 863 F.3d at 358.

Here, the magistrate judge issued a report and recommendations advising the district court to grant Williamson County's partial motion to dismiss. At the end of this report, the magistrate judge warned the parties of the consequences of failing to file written objections. No objections were filed. We therefore review for plain error. To succeed under plain error review, Acosta must show: "(1) an error; (2) that is plain or obvious; (3) that affects his substantial rights." *Id.* at 358. If these three elements are satisfied, this court has discretion to correct the error if it "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)).

But regardless of the standard of review, we find no error on this issue. The only argument raised in the section of Acosta's opening brief addressing municipal liability is Acosta's contention that Williamson County failed to reprimand or discharge Hoffman after the alleged incident of excessive force. Since we hold that Acosta has proffered insufficient evidence for a reasonable

jury to conclude that Hoffman committed a constitutional violation, we can summarily affirm the dismissal of Acosta's policy-based claims related to excessive force, since the County cannot be held liable for a policy failure if the plaintiff has not proved an underlying constitutional violation. *See Brown v. Lyford*, 243 F.3d 185, 191 n.18 (5th Cir. 2001).

Plus, Acosta appears to press on appeal a ratification theory of municipal liability, which generally provides that if "authorized policymakers approve a subordinate's decision and the basis for it, their ratification [is] chargeable to the municipality because their decision is final." *Sligh v. City of Conroe*, 87 F.4th 290, 303 (5th Cir. 2023) (quoting *World Wide Street Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 755 (5th Cir. 2009)). This court has consistently held that a municipality failing to investigate an incident or failing to discipline an officer, absent additional allegations indicating that superiors approved of the conduct at issue or deemed the officer's actions consistent with municipal policy, does not adequately establish a ratification claim. *See, e.g.*, *Peterson v. City of Fort Worth*, 588 F.3d 838, 848 & n.2 (5th Cir. 2009); *Milam v. City of San Antonio*, 113 F. App'x 622, 628 (5th Cir. 2004).

Additionally, Acosta claims that Williamson County "acted with deliberate indifference to his serious medical needs," referencing this court's standard for adjudicating a pretrial detainee's claim of inadequate medical care under the Fourteenth Amendment. *See Cope v. Cogdill*, 3 F.4th 198, 206–07 (5th Cir. 2021). Acosta did raise a Fourteenth Amendment claim against Williamson County alleging that the County failed to provide adequate

medical care, but the district court dismissed this claim per the magistrate judge's recommendation.[8] We find no error in the district court's decision.

"To establish municipal liability under 42 U.S.C. § 1983, a plaintiff must show: '(1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy (or custom).'" *Ford v. Anderson County*, 102 F.4th 292, 319 (5th Cir. 2024) (quoting *Newbury v. City of Windcrest*, 991 F.3d 672, 680 (5th Cir. 2021)). "Generally, a plaintiff must show that the policy was implemented with 'deliberate indifference' to the 'known or obvious consequences' that a constitutional violation would result." *Id.* (quoting *Alvarez v. City of Brownsville*, 904 F.3d 382, 390 (5th Cir. 2018)). "Proving deliberate indifference in a municipal liability action generally requires showing that a policy caused a pattern of constitutional violations, and proving deliberate indifference based on a single incident requires showing that the injury suffered was a 'highly predictable' consequence of the policy." *Id.* at 320 (quoting *Valle v. City of Houston*, 613 F.3d 536, 547, 549 (5th Cir. 2010)). "In order to find a municipality liable for a policy based on a pattern, that pattern 'must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees.'" *Davidson v. City of Stafford*, 848 F.3d 384, 396 (5th Cir. 2017) (quoting *Peterson*, 588 F.3d at 850). "A pattern requires similarity, specificity, and sufficiently numerous prior incidents." *Id.*

---

[8] Acosta's appellate brief also appears to allege that Hoffman exhibited deliberate indifference by "ignoring [his] requests for his prescribed medicines and CPAP machine," but Acosta never brought a Fourteenth Amendment claim against Hoffman alleging a failure to provide adequate medical care.

No. 23-50777

Acosta's second amended complaint only notes one other instance of an individual receiving purportedly inadequate medical care at Williamson County Jail, which is insufficient to establish a pattern. *Cf. Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002) (concluding that eleven instances of warrantless searches were insufficient evidence of a pattern). The complaint also fails to point to an obvious infirmity in Williamson County's policies indicating that constitutional violations would be a "highly predictable consequence." Acosta's policy-based allegations related to medical care are highly generalized; he broadly speculates, *inter alia*, that Williamson County has inadequate funding for medical care and inadequate training/supervision. He has not pointed to any specific, official County policies that are obviously constitutionally infirm, nor has he provided any explanation as to *how* the County's policies are obviously inadequate. These conclusory generalizations are insufficient to plead a municipal liability claim under § 1983. *See Sligh*, 87 F.4th at 303; *Calhoun v. City of Hous. Police Dep't*, 855 F. App'x 917, 922 (5th Cir. 2021). Thus, Acosta's complaint fails to adequately allege that a Williamson County policy was a "moving force" behind any constitutionally inadequate medical care he may have received.

Acosta's other arguments related to municipal liability, which were raised for the first time in his reply brief, have been forfeited. *See Guillot ex rel. T.A.G. v. Russell*, 59 F.4th 743, 751 (5th Cir. 2023). Regardless, we find these additional arguments to be meritless. These arguments primarily pertain to policies that were purportedly a "moving force" behind Hoffman's use of excessive force. We find these arguments unpersuasive, because: (1) as noted above, Acosta has failed to establish that Hoffman utilized excessive force; (2) Acosta failed to allege a pattern of similar incidents of excessive force; and (3) Acosta's policy-based claims related to excessive force consist entirely of conclusory generalizations, and Acosta does not point to any obvious infirmities in Williamson County's policies

indicating that constitutional violations would be a "highly predictable consequence."[9]

We find no error in the district court's thorough and well-reasoned holding on this issue, much less the plain error that Acosta is required to establish. We accordingly AFFIRM the dismissal of Acosta's § 1983 municipal liability claims.

## VII.

Finding no reversible error in the district court's proceedings, we AFFIRM the dismissal of Acosta's § 1983 municipal liability claims against Williamson County, as well as the grant of summary judgment for Defendants-Appellees Hoffman and Williamson County on all remaining claims.

---

[9] For example, Acosta alleges that Williamson County had policies of "[e]ngaging in use of excessive force on pre-trial detainees" and "[e]ncouraging escalation rather than de-escalation." Obviously, these are not written County policies, but Acosta can establish that a custom exists by showing "a persistent, widespread practice of [County] officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001) (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984)). But Acosta has not sufficiently alleged a pattern to establish a "persistent, widespread practice." Nor has he pointed to an official County policy that is so obviously infirm that it would provide notice to municipal policymakers that a constitutional violation would be a "highly predictable consequence." Therefore, we find that these conclusory policy-based allegations are insufficient to support a § 1983 claim against Williamson County.

RECEIVED

# *United States Court of Appeals*
## FIFTH CIRCUIT
### OFFICE OF THE CLERK

LYLE W. CAYCE 2024
CLERK

CLERK, U.S DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____DEPUTY

TEL. 504-310-7700
600 S. MAESTRI PLACE,
Suite 115
NEW ORLEANS, LA 70130

September 06, 2024

Mr. Philip Devlin
Western District of Texas, Austin
United States District Court
501 W. 5th Street
Austin, TX 78701-0000

           No. 23-50777    Acosta v. Williamson County
                           USDC No. 1:21-CV-615

Dear Mr. Devlin,

Enclosed is a copy of the judgment issued as the mandate and a
copy of the court's opinion.

One envelope of exhibits is returned.

                              Sincerely,

                              LYLE W. CAYCE, Clerk

                              By: _____
                              Melissa B. Courseault, Deputy Clerk
                              504-310-7701

cc:
      Mr. George Edwards III
      Ms. Stephany M. Simien
      Mr. Benjamin Thomas Zinnecker